Good afternoon, judges. Mary Ann Bakkers and Tony Cambarello on behalf of Bruce Wayne Morris. Your Honors, I'd first like to point out that the Certificate of Appealability that was issued by the District Court encompassed Brady review, both with respect to the Roberts letter and the Marshall memo. So this Court is authorized to determine whether a Brady violation occurred with respect to both of those documents. The main issue before this Court concerns whether the undisclosed evidence was material and whether a petition was prejudiced by the prosecution's failure to disclose it. And just let me say that I'd like to reserve 10 minutes for rebuttal. The answer to this question is yes. Undisclosed evidence affects the guilt phase or the penalty phase? The guilt phase, Your Honor. The guilt phase? It doesn't affect the penalty phase? Well, it affects the penalty phase as well, but this Court has already set aside the penalty judgment. It certainly affects it in terms of the any decision-making that the jury would do about their respective culpability of the individual. Aren't you getting a new penalty phase trial already? Yes. So whatever there is out there is out there and you have it now. It's correct, Your Honor. So you don't have to decide anything more about the penalty phase at this time. That's right. I'm in agreement with you about that. So we're only talking about the guilt phase? That's correct. At this point. Just responding to Judge Ferguson's question. This evidence is material under either the Brady standard or the Mooney-Nippoo line of cases. The prosecution's case was primarily focused on three issues and individuals. They were Yvette Barrett, Allison Ekstrom, and Bruce Morris's confessions. Now, we know that the confessions did not have the decisive impact on this case to which the Attorney General has ascribed them. I want to ask you a little bit about that. It seemed to me that there were aspects of these confessions that were quite compelling, the first being that there were several confessions, not just one, and to a variety of people at a variety of times. And so it wasn't just a one-time momentary passing thing. And the other is that they were consistent with the physical evidence, including the blood-spattered pants. And so I guess I would like you to tell me why that evidence isn't so great that nothing else really would have made a difference. Well, Your Honor, there's several reasons why that's true. One of them is that it was the defense contention that Bruce Morris confessed repeatedly because he believed that Yvette was pregnant with his child. And, in fact, Yvette testified at page 4302 of her testimony that Bruce thought that she was pregnant with his child and that he acted out of misguided loyalty and chivalry to try to protect Yvette and his, he thought, unborn child from being incarcerated when his child was born. But I would dispute Your Honor's conclusion that the evidence was consistent with what, excuse me, with Mr. Morris's confessions because, as trial counsel pointed out in his closing argument, as he also mentioned during his evidentiary hearing testimony, Mr. Morris was a very big man. And the testimony was that he supposedly hit Mr. Van Zandt 13 times with a large rock. And, as Mr. Conditt, trial counsel, pointed out, if Bruce Morris had hit him 13, it wouldn't have taken him 13 times to disable or to kill Mr. Morris. Additionally, it was... Well, you know, people are, this is an odd thing to say, but people are actually harder to kill than popular television would have us believe. You know, I mean, there's another case on the calendar this week in which someone was stabbed 37 times and hit over the head and didn't die and lived to, you know, tell the tale.  Well, Your Honor, I think, excuse me, I think what I think really happened here, though, is if, what we have to look at is what actually happened at trial here. And if the jury really felt that the confession was so significant and so dispositive of this case, they wouldn't have been out over three different days deliberating. And we know from Broda v. Canberra at 350 Fed 3rd at page, I believe it's 1009, and from Jennings v. Woodford at 290 Fed 3rd at page 1019, that this Court considers it to be a close case when a jury is out for that length of deliberations. So I do not think that the jury adhered to the great significance to the confessions, as the State would have us believe. Help me out with the evidence in addition to the confessions. Yes. By the time we've got the testimony from the three key people, Allison, Yvette, and then Mr. Morris, we know that the story of Allison and Yvette is roughly comparable. It's different in some of the details, but it's roughly comparable. We know that Mr. Morris' story is, contrary to his earlier statements, whether they're confessions or not, is that he's down at the stream fishing. Mr. Van Zant goes up before him. He follows maybe 20 minutes later or so. He sees both of the young women, the girls, outside of the van, both of them upset. His story is that he learns that Mr. Van Zant tried to rape Yvette, the older of the two, his girlfriend, and that Allison has hurt him very badly with the rock. According to his story, it turns out that it had to be the fatal wounds. I mean, there's the later hitting with the stick, but the rock hitting has already taken place. I've got the following problems with Mr. Morris' story, quite independent of his confessions. Number one, his claim of rape is ostensibly supported by the fact that Mr. Van Zant's pants have been pulled down so that sort of the waist level or belt level of the pants is about at thigh level. Yet we learn through the course of the examination that the belt buckle is still buckled, which is an odd way, if somebody's going to try to commit rape, an odd way for the pants to be. We also know that Mr. Van Zant had been drinking very heavily during the day, and the consequence of heavy drinking and sexual ability is to at least cast some possible doubt on that. We have what seems to be a clearly difficult story that Mr. Morris is telling about the manner in which he takes Mr. Van Zant's body out of the van. And we finally have the problem with, well, if what had happened was that a vet was being raped by Van Zant, and Allison then, in order to protect her sister, hits him repeatedly and injures him, what turns out to be fatally, with a rock, why was your response to leave him down in the gully, drive away all the way to the Midwest and so on, instead of simply going for help and to the police? Because the most that could have been charged at that point would have been some form of protection. I mean, we weren't looking at first-degree murder. Who knows what kind of lesser charge we were looking at. Okay, all those are problems with his testimony, independent of the confessions. Can you help me out on that? Okay, Your Honor, I have several observations here. First of all, although it's not part of the record before you, it's my recollection that I have seen a picture of Mr. Van Zant's body as it was found at the crime scene, and his pants are down to his knees, beyond his knees, is my recollection. The testimony repeatedly is that the belt is at about thigh level, but I've not seen that picture. You know, it's been a long time since I've seen that picture. Secondly, it's my recollection – The key point for me is not how far down they were pulled, but that the belt was still buckled. Secondly, it's my recollection that one of the forensic experts testified that semen was found in his underwear. That's correct. Yes, that's right. Thirdly, with respect to the three of these folks – well, with respect to their competing descriptions of what happened, I think it's quite clear that all of them are not functioning normally, are not functioning with normal mental faculties. But if the jury accepted as true, or if even a single juror accepted as true Mr. Morris's testimony in this case, there were a variety of other charges that they could have convicted him of other than first-degree capital murder, particularly this last scenario that the Court has described. If Mr. Morris – if, in fact, a juror believed that he came back and came upon the scene and got in the van with the vet in Ellison and left Mr. Van Zant there, regrettably, of course, then there was a strong argument, as Mr. Condit noted in his closing argument, that Mr. Morris might only be convicted of accessory after the fact, because he was not involved in the assault on Mr. Van Zant. And there was a reasonable and plausible basis upon which a single juror might have voted not to convict or to convict of some lesser offense. Here's my difficulty, which is, you know, one step beyond what Judge Fletcher has been asking you about, and that is as follows. If we were to follow through on everything that you want from these two pieces of evidence, you would have had a letter that said, I've heard that they're all equally guilty, basically, which says nothing about Mr. Morris not being guilty. It just says they're all equally guilty, so there's a question of whether that's even exculpatory. And you would have had Yvette not testifying because presumably she was lying, right? I mean, you would have had a trial without her. If nobody could figure out what the truth was. So you still would have had his story, the other sister's story. What makes you feel that there's any possibility that the jury would have been wanting to believe him if they had had one less witness? Well, Your Honor, perhaps there wouldn't have been a capital murder trial at all if the prosecution had fulfilled its obligation to sort out the problems with these witnesses before it decided to go to trial. Then I get back to the confessions, and he has an explanation, but the jury's not obliged to believe that. And there's no evidence whatsoever that the other sister was lying, not even a suggestion in a memo somewhere else. Well, no, that's not quite true, Your Honor, because Ellison Ekstrom was given a polygraph, which she failed. So there is evidence that she lied and that the prosecution had a reason to doubt her testimony. Now, that evidence, that polygraph was, of course, not in evidence. No, it wasn't in evidence, but surely the Court can consider that in deciding whether the response to the Court's question here. So what the problem here was that there was a plausible explanation for Mr. Morris's inculpating himself. However misguided it was, there was an explanation provided to the jury about it. And then what you had was the prosecution presenting about Barrett to the jury as a truth-teller. In fact, what her plea agreement stated was that she had to testify truthfully as to every fact in this continuum of events from the time they left Sacramento hitchhiking until the time that they were arrested in Nebraska. And what the plea agreement further stated is that if she lied about any of those facts, that the prosecution shall nullify her plea agreement and prosecute her for murder. And they didn't. No, they didn't. But it was undisclosed to the defense that the prosecution believed that a vet had lied and lied under oath at the time of trial. And if they — Let's say at the close of her evidence, the prosecutor had come to the trial judge and said, you know, we're just so uncomfortable. We think that this witness has lied. We want — what would have happened? Either you would have had a new trial without her as a witness, or you would have had an instruction to that jury to disregard her testimony. But that's why I say you have to convince me that without her testimony, that somehow the result of the case would have been different. Well, without — as I've said, Ellison — well, we know the Ellison person. The trial, as it went forward, without her testimony, I mean, it strikes me that you might have been better off having her because she was so squirrelly on the stand that she wasn't very believable. I mean, to have her there being squirrelly might have been more to your advantage than having her not there at all because she has to this day not testified in your client's favor ever. Well, Your Honor — In this setting. Excuse me. I'm sorry to interrupt. In fact, during the closing argument, Mr. Rossi mentioned — he talked about problems with Ellison's testimony, that she lacked any sort of mental maturity, and that, in fact, what her testimony — in her testimony, she relied on her dreams in order to justify what she was saying. And she was very confused as well, and the prosecution admitted that. And the prosecution said the same thing as to Evette's testimony. In his closing statement, Mr. Rossi says, you know, I've got trouble with both of their testimonies. Well, he said that he had trouble, but that was a rhetorical device, Your Honor. What he also said is that she told the truth. He described any testimonial problems that she had to the trauma of the events, the passage of time, the lack of intellect, and innocent misrecollection. And you can find that at — Let me ask you this. Putting the case as strongly as you can for your side, what can we reasonably or even plausibly think Evette might have said had she been telling the truth that would have exonerated or put — given Mr. Morris a different level of conviction, or maybe I'll say it this way, that would have corroborated his story? Well, let's look at it this way. There were three jailhouse women who were incarcerated with Evette who came in and said, testified on behalf of the defense that Bruce — that Evette was saying that Bruce was taking the fall for her, that she and her sister had rocked and rolled Ricky Van Zandt. They said that they had determined that she was a liar, and she admitted striking him herself with some sort of weapon. Now, help me with that second one, that she and her sister had rocked and rolled Ricky Van Zandt. That part I don't remember. Where is that? That's — well, this is in the testimony of — it would be Del Crane, Jean Baker. Your Honor, could I — I'll come back and — You can do that in rebuttal, if you like. Okay. It's discussed — the testimony of these three women is discussed in the reply brief. Okay. I'm going to ask you a long question, which affects not only the — which affects the prosecution of this case. And that prosecution is not only the guilt phase, but also the death penalty phase. We have a situation in which there's a horrible murder, and we have a situation in which three people are involved, and there's conflicting testimony as to who the actual murderer was. Right? That's right. Now, the DA says that all defendants lie. Yet, knowing that, that all defendants lie, the district attorney grants relief, a pay bargain, to two of the defendants and seeks the death penalty as to one, in spite of the fact that there is a tremendous amount of evidence as to who actually was the actual killer. Now, my question to you is, is the act of the district attorney in seeking the death penalty unbridled discretion? Or is that discretion subject to due process of law and equal protection of the law? Well, certainly, the prosecution — What is the law in California on that subject? Oh, jeez, Judge. You know, I can't answer you off the top of my head, but I will tell you that I agree with the concurring opinion that you issued the last time that we were here and the legal theories and cases that you cited in your concurring opinion the last time we appeared before this Court. So I'd like to reserve the remainder of my argument. You may do so. Excuse me one minute, Mr. Campbell. Just before you get started, while the question is still in my mind, does the district attorney have unbridled discretion as to who he seeks the death penalty? Or is he bound by due process of law and equal protection of the law? Before you answer, could you just state your name for the tape so that we have your appearance, and then please do answer Judge Ferguson's question. Certainly, Your Honor. It's Ward Campbell, Deputy Attorney General. Susan Bunting is with me, Deputy Attorney General. Your Honor, in answer to your question, no, I don't think the discretion of the prosecution is unbridled. Certainly, the prosecutor cannot take into account any types of invidious classifications or categories in choosing who to seek the death penalty for or not. There are cases that say that? Well, certainly, I think that's the implication of the type of case law that we've seen over the past that has looked at, although it has ultimately rejected it, sophisticated information about it. Why, in this case, when he knows in his own mind that all three of these people are liars, and maybe not even liars, they're perjurers, why, then, would he seek the death penalty as to only one? Well, Your Honor, to start a couple of premises of the questions here, I think the prosecutor, and obviously what we're, first off, let me start respecting about something here that's not on the record, but I'll be glad to do that with you if you'd like. The prosecutor is looking at a case in which you have three people. You have a man who has confessed multiple times, in multiple circumstances, in multiple contexts to be the actual perpetrator of the murder. He's a person with a prior record for violent crimes. The accomplices, while they certainly were involved in the planning of the crimes, are young, do not have those kinds of records. In deciding who the appropriate candidate is for seeking the death penalty, it's not inappropriate for the prosecutor to make that type of decision. Now, furthermore, a prosecutor who's looking at putting on a trial realizes that he's going to be introducing evidence of these confessions and statements. He doesn't know whether or not, in the long run, all those confessions or statements by Mr. Morris are going to stay in. In fact, virtually every one of them, except for the confession to Tom Logan, was challenged at some point in the litigation and was an attempt to exclude it. So, unfortunately, in a situation like that, the other factor you look at is, do I need other witnesses? The other natural witnesses are, in fact, the other people who were involved in the crime. That will frequently involve something like this, a plea bargain or an immunity agreement, in the case of Ms. Ekstrom, in return for their testimony. Now, all those factors are taken into account. A plea bargain of the two women because he wanted them to testify against the defendant. I mean, Morris. But in spite of that, he knew that all witnesses lied, and he knew that these two women were going to lie. Let me be careful. When you say that he knew all witnesses were lying, which prosecutor are you talking about, Your Honor? I don't think you mean all prosecutors in general. I don't think we have any evidence about what the DA who made the original charges and the original arrangements, who's a man named Phil Lowe, I think his attitude was that I have a defendant who has confessed multiple times, and that women, two women accomplices, were, in fact, also giving me information, for the most part, is consistent with his confessions, and it's consistent with the physical evidence of the crime. Counsel, we no longer have the death penalty in front of us, correct? That is correct. This Court has vacated that penalty. Yes. I'm talking about the prosecution. I'm talking about the entire prosecution of this case. Well, in the context that there's no penalty, Your Honor, I think I've answered your question. I think that the prosecutor had legitimate reasons to make the distinctions he did for purposes of charging and for purposes of deciding how to seek the death penalty or who to seek the death penalty for in this case based on the nature of the evidence and the character of the offense and of the offenders, which are the appropriate circumstances to take into account in exercising that discretion. Can I ask you a question about this letter from Mr. Morris to Lyle, who must be Mr. Shattuck? Well, I can't quite read it. It's something 284, the letter where he says there's a missing page. Yeah. Why do we even have that letter? That certainly looks like attorney-client material. Well, it came out as part of the discovery in this matter, Your Honor, that occurred. Why is it even discoverable? Well, the discovery was ordered because we were in the process of litigating an ineffective assistance of counsel claim and the defense files were made available to us as part of the omnibus ineffective deficits. So it comes out in the IAC business. Is it something that we're allowed to look at? Obviously, it's in your favor because it undermines his explanation as to why he wrote that letter. It came in as an exhibit in this case, Your Honor. And I think since there is some claims about who has been and was not telling the truth in this case and who we should believe and not believe, that letter, of course, is, in fact, one more indication of Mr. Morris' continued fabrication of evidence in this case. But do I get to consider it when I'm asking whether or not certain things were harmful or harmless because that evidence clearly would never have gone to the jury? You're right. I'll make it clear that I'm responsive to the concerns that have been raised about the ability of the defense to prove or not prove their case at this time. So I'm looking at whatever other evidence is currently available that may be helpful to the court and might have been helpful to the district court. But it's not helpful in the sense that it would never come out in a retrial. If we were to agree that a retrial is appropriate for the sake of the question, it would not come out. Yes, and I'm not contending that. It would not be visible. Yes. So it's off to one side in terms of harmlessness, it seems to me. It had to do with the ability of the district court and of this court, if there's a question about assessing what to do retrospectively in light of this evidence, to me or to respond that this information was helpful in assessing, once again, the fact that it was Mr. Morris who was continuing, in fact, we have evidence to fabricate and falsify information about his involvement in this case. The question is whether or not the withholding of the cover letter from Michelle Roberts and the withholding of the information about the, I'll call it the gums memo, was harmless. It's totally irrelevant because this evidence was not presented to the jury and if there were ever a retrial, would never be presented to the jury. And for purposes of assessing the trial that happened in a retrial, you are correct, Your Honor.  Let me ask you this. I gather that we have evidence that you saw Yvette's file on March 5, 1996. That is correct. And did you see these two, I'll call them disputed items, the Michelle Roberts letter and the gums memo at that time? I did not see both of them. I'll make it clear what I saw and when I saw it, if that's helpful to you. Yes, that's what I want to know. Sure. I did see the memo. Which memo? The gums memo. The one that uses the word perjury. Yes. I saw that in 1996. I did not see, and all I can say is I constructively, I guess, saw the Roberts letter in 2004 when I went through the prosecution files in this matter. Frankly, if I saw it, it didn't register with me as if anything of particular significance. It was only, yeah. But you saw the gums memo in 1996. I did. In 1996 I did. And what, if anything, did you do about that? I looked at the, I saw the memo. I looked at the entire record I had before me in this matter, and I concluded at the time what the memo was was basically an internal memo indicating that there was a consideration that needed to be given to whether or not Ms. Barrett should receive the benefit of her plea bargain or not. Well, but it should have told you as well that there was a possibility that the prosecutor had knowingly allowed perjured testimony to go to the jury. Well, actually, given the facts and circumstances of the case and the scenario, I did not see that as, in fact, being a possibility in this matter. Well, you had to have seen that as a possibility. The word perjury is in there. Well, Your Honor, I agree. No, let me finish. The word perjury is in there. The effect of the memo says she's got a plea scheduled for June 24th. We're going to get the transcript, and we're going to see whether or not it's something that validates the plea. We know that the plea is then entered on the 22nd of July, but we know that it was of sufficient concern, and the word perjury is there, that that's pretty, that's real evidence, whether conclusive or not, I'm not yet saying, but that's real evidence that there was perjury at trial  You can't say it was impossible to read it that way. It's clearly possible to read it that way. That's what it says on his face. Your Honor, what it didn't say was that there was undisclosed falsity that went to the jury. Wait a minute. Only a lawyer could make that argument. Well, I'm a lawyer reading. I'm a lawyer reading. What does perjury mean besides false? I mean, I don't understand your answer to Judge Fletcher's question. Well, let me clarify for you if I can. First off, in fact, I was a lawyer reading the document that was prepared for a lawyer. Perjury certainly means falsity. I agree with you there. The person who prepared it, of course, ultimately indicated that she didn't mean it in a legal sense. She meant it in the sense of just falsity. But what it said was perjury. It also said it needed to be determined, which does not, in fact, indicate an unequivocal statement that there was undisclosed perjury at the trial. We have testimony by a vet, which, of course, is replete with inconsistencies and impeachments and obvious changes of testimony. Part of the difficulty is that if and when you can't do it. I'm sorry. Can I add a few more factors? I apologize. Because I know this is important to you. It's important to me. And I also know that in the probation report that's also in that file that the witness herself is upset because she knows the special prosecutor is upset with her about inconsistencies in her testimony. So I see all those factors. And the conclusion is that what we have here is basically an internal memo that was the basic. So long as we're on this, let me just read it to you so that we're on a common text here. We've all read it before, but it says, defendant perjured herself at trial, period. Prelim set for 624.87 was postponed until court transcripts were received to determine exactly what defendant said. It did not say to determine whether she perjured herself. It says she perjured herself at trial, and now we've got to find exactly what it is that she said. Well, the next reference, actually, I think next line, is it for pre-determined for determination of perjury? That's right, for determination of Barrett's perjury. So when you read the entire document, what you have here is, in fact, the information was given that Ms. Barrett had problems as a witness, and her agreement with the prosecution. But it strikes me, if this is what's going on here, this is genuine evidence that there was perjured testimony that went to the jury. You can't say otherwise. I mean, it may not be conclusive, it may not have been perjured testimony, but this is evidence that there was. There's no doubt that she gave false testimony at the trial. She changed her testimony when she testified. She admitted that. She did 180-degree turns when she testified. But her changing her testimony and giving false testimony at trial are different. She changed her testimony from the previous statements she had made. She also gave testimony at trial that was inconsistent with earlier things. Her lawyer, Heidelberg, I think that's his name, calls a recess so that she can correct it later on. What other perjury she might have committed, I don't know. And one of the problems I'm having with this, of course, is that in 1996, the person who was in the best position to tell us this is Mr. Rossi. He's dead in 2002. And you're not doing anything between 1996 and 2002 prevents us from having any inquiry for Mr. Rossi. Well, Your Honor, the point is, and I think the contemporaneous evidence of it shows, that what we had here was a witness who had an agreement to give complete and truthful testimony under which there would be no obligation to dismiss her charges. And if she didn't, that the prosecution would not be under any obligation to dismiss her charges. And that this memo was, in fact, indication that, you know what? She didn't give complete and truthful testimony. Everybody knows that. Everybody knows that. Would you please quit misstating this memo and say she committed perjury? Your Honor, we had testimony about how that memo was prepared. I read every bit of it. Okay. And I don't think, I think that when you, with the evidence of how that memo was prepared, as viewed in the context of the record, that this, in fact, was, I think as the magistrate put it, a perjury question memo. It was, in fact, given her testimony what determination should be made about whether or not she should get the benefit of her plea bargain or not. And when it was finally disclosed in 2004, the person probably in the best position to testify about his meaning, Mr. Rossi, is dead. And instead, the only person who would get direct testimony is Mr. Marshall, who is characterized, I think, rather generously by the magistrate judge as the forgetful Marshall. Well, if Mr. Rossi had information that he didn't want to have about her testifying falsely, for instance, that he didn't want to see disclosed, he certainly never would have made the kind of communications that were made to the Attorney General's office, because that would have certainly led to a chain of events, quite possibly, where she would not have gotten the benefit of her bargain. There would have been proceedings in court about Ms. Garrett, and all this information would have come out. So Mr. Rossi's behavior and actions at the time are not consistent with someone who is trying to conceal the idea or the fact that there might have been false testimony at trial. This was a prosecutor who was unhappy with how a witness performed. Let me make you a hypothetical and tell me how you think that the prosecutor should have responded. Let's say there had been more in this file. The first memo was the one that Judge Fletcher has read to you, and there's a second memo that says, I've looked into it, and I've concluded that she lied about A, B, and C, but those things were not material, in my opinion, and, therefore, she'll still get the benefit of it. We had a complete explanation. Why wouldn't that still have been disclosable to the defense as up to them to pursue whether it's material or not material? I guess I don't really understand why this presumed explanation relieves the state from the obligation to have given this material to the defense. I'm not so concerned with the other letter, which basically says, I heard from a third party that they were all guilty, which seems to me not exculpatory and not particularly relevant. But this material, I just don't understand, explanation or no, why that shouldn't have been turned over right away as soon as it was discovered. By you. By you. Okay, I want to make sure you hear it. Right, by you. Right. Because I made the decision, which a prosecutor can make, that this was not material. This was not material information. I don't think that was your decision to make, given what it says. Well, I, in fact, am left with that judgment call. Well, in my view, and now speaking only for myself, you as the State, of course, have obligations beyond conviction. You have obligations to be fair. And hanging on to this for the period until you are finally ordered directly to turn over the entire file. So from the period of 1996 to 2004, during which Mr. Rossi has died, was improper conduct. Well, Your Honor, all I can tell you is I felt that I exercised my duties and obligations, and I'm aware of them. I felt I exercised it conscientiously. Well, I disagree as to the nature of your obligations and to what you did. Well, that said, let's assume that Judge Fletcher is correct, that this material should have been turned over in 1996, and that there was misconduct. What result flows from that with respect to this conviction, if any? Does that mean as a legal matter that the State loses and he gets a new trial, or do we look for prejudice? And if so, looking at it most favorably to Mr. Morris, what prejudice could there be from this? Well, there is not a rule of automatic reversal in regards to this type of error. And I think, once again, as the district court pointed out below, there were, in fact, opportunities for Mr. Morris to present evidence to buttress his showing, which he failed to show or failed to present, that, in fact, Yvette Barrett did commit perjury in this case. Yvette Barrett was an attorney. You said plural. The only one the magistrate judge referred to was the opportunity to call Yvette. Well, Yvette was available to testify. There was also a showing made, though, initially, that they were planning to call Michelle Roberts to testify to statements Yvette had made. They didn't call Michelle Roberts. They made a showing they were going to call a witness named Mr. Volker to testify to statements that, arguably inconsistent statements that he said Yvette Barrett had made. They chose not to call Mr. Volker. They made a showing or asked that they were going to call a psychologist to testify that Mr. Morris had a mental problem with confabulating confessions or statements, and they ultimately failed to do that. They had an opportunity to present evidence to buttress their claim, and they failed. They did not do that. And so, given that proffer, they really don't have anything to show that what we have here is any more than what it appears. Because Yvette Barrett gave inconsistent testimony during her trial. Yvette Barrett has never to this day testified in Morris' favor on the facts. She did not recant or come forward in this proceeding and say, I did it, he didn't do it. That's not anywhere here. But let's assume that the prosecutor at the close of the trial or before the jury deliberated had come to the court and said, I think Yvette Barrett has lied. In other words, the text of the memo had been disclosed right then and there at the time of trial. What would the trial judge have done, do you think, and what effect would it have had on the outcome of the case? Well, I guess it would depend, I think, on the nature of the lie. Once again, the measure for false testimony is whether it would be a reasonable likelihood that the outcome would have been different or the verdict would have been effective. It's basically the equivalent of a harmless beyond a reasonable doubt standard. So it would depend on what kind of lie we're talking about. He might have gotten a new trial. If there was evidence that she had lied about who hit Mr. Van Zandt, for instance, and it had been presented at the time, that would have been something the trial judge would have had to take into account to decide whether to give Mr. Morris a new trial or not. Had he gotten a new trial and had Yvette Barrett not been able to testify, presumably all the rest of the evidence would have come in essentially the same way. Yeah, although I don't know at that point how it might have affected, obviously. Now, obviously, we're getting into a range of speculation about how that would have affected the prosecutor's decision about retrying Mr. Morris, given what the nature of the report was about Yvette Barrett's lying. It would have affected the nature of the agreement, certainly at that point with the prosecution she would have. And there are a lot of variables there that I think would make it hard to predict exactly what would happen in that type of situation. Obviously, depending on the nature of how this lie was uncovered, that would be admissible evidence that the trial potentially is a declaration against interest or something like that against Yvette Barrett. So on a retrial, I have to be honest with you, I think it would be hard to predict what would happen. But that's all speculating exactly what the nature of that lie would be. And nothing in this record tells us. Excuse me? Nothing in the record tells us as far as I can determine. There's never been any evidence presented since the time of the trial to contradict or to add anything that would indicate about Yvette Barrett's credibility and what she testified to at that trial. And there was an opportunity to do so that was not pursued here in the district court. So there is, in fact, no evidence that would indicate that the result would have been any different or could be any different. And unless there are any more questions, I'll submit it. I have no more questions. Judge Ferguson, do you have any more questions? I think we understand your position. Thank you. Ms. Backers, you have some rebuttal time remaining. First of all, Judge Fletcher, in response to your question about the three women, jailhouse women who were incarcerated with Yvette, about their testimony and where it could be found. Yes, please. This is discussed at page 24 of the appellant's reply brief. And there are citations to the record. And I have the record. I have the ER here in front of me. Where in the ER do I look? I don't know. I don't believe the testimony of these women is in the ER. Oh, please. Pardon me? If you want me to look at it, please put it in the ER. Yes, Your Honor. Okay. I spent the last several days reading every page of the ER. Yes, Your Honor, I understand. Okay. Now, going back to the standard of review that this Court must use in order to evaluate what should be done here. The standard under Brady and Napoo is whether or not the undisclosed evidence puts the case in such a different light as to render lack of confidence in the verdict. I don't think that there can be any question but that a memo stating that a witness has committed perjury completely undermines the credibility of the central prosecution witness in the case. As we know from Benn v. Lambert, the fact that this Yvette was the central prosecution witness whose testimony presumably would have been undermined by this, that this is precisely the kind of reason that the jury could have seen her testimony and seen the case. I'm trying to figure out, in Mr. Morris's favor, what story Yvette could have told that we might reasonably, even plausibly expect is true. That is to say, that would inculcate her more and would then have the effect on the verdict that you want it to have. One way of looking at it is, of course, just let's pretend Yvette never testified and the trial went on as it did except for the fact that she's not there. And Mr. Campbell says, I think quite rightly, well, maybe that would have happened, maybe not, because if she's not there, various other things might happen. But let's assume she gets on the stand and she testifies truthfully. What truthful story are you imagining that she would have told that would have gotten you where you need to get? That, in fact, Yvette and Allison were the ones who perpetrated the deadly assault on Mr. Van Zant and that Bruce was down fishing when this occurred. Neither one of them has ever said that, though, right? Well, but, Your Honor, the whole idea here was, and what we believe that Michelle Roberts' letter shows, is that Yvette and Allison were engaged in a conspiracy to take advantage of Bruce, as he had willingly made himself available to do, and in a very misguided fashion, I might add, that they were willing to give him, put it all on him, and escape their own responsibility for this. And we have evidence about that because of the testimony of the jailhouse witnesses. So in that way, and what we also have is the statement, the removal from Yvette's plea agreement, the requirement that she not have struck Ricky Van Zant, if, in fact, she came in and testified that she had struck him, that it was her responsibility, then that would absolve Mr. Morris of responsibility, too. Well, Mr. Morris' story is, I have to say, a somewhat improbable story. His story is that because Mr. Van Zant tried to rape Yvette, the younger sister, who was, I believe, 15 at the time, inflicts the blows that kill him. I think it's unlikely that Mr. Van Zant actually tried to rape for the reasons that I kind of went over. I mean, I guess anything's possible. But it's possible, of course, that Mr. Morris thought that because he wasn't there. He comes back up from the river and the girls tell him this story. So maybe he tried to rape, maybe not. But then that leaves me with a story of, well, he's saying that Allison, a 15-year-old girl, kills this man. Well, Allison and Yvette, and this is what Mr. Condon argued as well, that it appeared to him that the way the blows were struck and the manner in which they were struck suggested more of a rage killing rather than somebody who wanted to immediately put Mr. Van Zant to death and take his van, as Yvette and Allison testified that Mr. Morris wanted to do. But, you know, I don't think that this Court has to parse Mr. Morris's story in the way that you're suggesting, because all that really needs to be done here under Kyle's is to determine whether this undisclosed evidence puts the case at a different light. And in fact, the prosecution did place its central, the central credibility of its case on Yvette Barrett's testimony. The jury was told that Yvette was a truth teller and that she had testified truthfully at trial. It was one of the last statements that Mr. Rossi elicited from Yvette Barrett was in her redirect testimony was that she was telling the truth. And in his closing argument, he also, he portrayed her as a truth teller and as somebody whose memory was, she had innocent misrecollection, not that she was a liar. You know, I'm now just quoting from Mr. Rossi's closing statement. He says, as to the testimony of Ms. Barrett and Ms. Ekstrom, that is to say Yvette and Alice, I think it was very obvious that both girls were not totally honest with the officer during their multitude of out-of-court statements. I have some problems with some of their testimony in this courtroom. But it's different than admitting and conceding that she's a liar, Your Honor, and admitting and conceding that she's a perjurer, when, in fact, she provides the central testimony, which is used to compare. Well, and of course, he is relying on that testimony, I understand, and of both girls, but he's saying, you know. Well, but, you know, it's not the same as saying, I think she's a liar, and you ought to look, you know, with, you ought to question the truthfulness of her testimony. It was clear that somebody was lying. They were all blaming each other, basically. And the jury was faced with a situation in which no one other than those three people actually knew the truth. But they did have physical evidence that was consistent with your client's guilt, and they had multiple confessions from him. And I guess that I have difficulty getting past that in a situation where, inevitably, they're all going to blame each other, and there's no one else who knows because there were no other witnesses. Well, Your Honor, what happened here is that there was a corruption of the truth-seeking process, because the State concluded, as this document said, that there was perjury at trial. And instead of doing anything both at the time of trial or in Federal habeas proceedings, when they could have brought this information to the attention of multiple courts, they failed and neglected to do so. That's why we're left with this conundrum about what really happened here. This could have been cleared up long ago and should have been cleared up. And what Bowie and Kojian tell us is that when there's this evidentiary gap, it was up to the prosecution to fill this in and bring this matter to the attention of the court at the time it occurred. Petitioner had no way of knowing about this information. He didn't know that the State had concluded that Ms. Barrett committed perjury. And, in fact, when the State once again came upon this memo during Federal habeas proceedings, the State continued to mislead this Court about that matter. And this, as the cases tell us, both Kojian and Bowie and Hayes and Silva tell us, that the State's continuing misconduct in failing to disclose this information is a matter for the Court to consider when assessing the materiality of the undisclosed information. It also shows us the extent to which the State was willing to go to keep this evidence from being disclosed to the defense under these circumstances, considering the manner in which this has been handled, particularly the fact that Mr. — the State continued to conceal this evidence during the time that my client was volunteering to be executed, and continued to urge on those voluntary execution proceedings that this Court should act to vacate Mr. Morris's conviction, not only because of the State's misconduct, but because of the corruption of the truth-seeking process in this case. Thank you. Thank you, Counsel. The case just argued is submitted, and we stand adjourned.
judges: Ferguson, Graber, W. Fletcher